[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband and the defendant wife were married on August 24, 1974 at Westport, Connecticut. They have been married nineteen years. The plaintiff is 46 years of age and the defendant 42 years of age. They have three children, Jessica, age 14, Travis, age 8 and Tyler, age 6. The plaintiff is a Dermatologist in private practice. The defendant is a licensed Radiologist and a Resident/Physician in Training-Psychiatry.
The court finds that the marriage has broken down irretrievably. Accordingly, a dissolution of the marriage is hereby ordered.
During a five day hearing both the plaintiff and the defendant testified along with other witnesses.
The plaintiff testified that he completed his residency at the University of Pittsburgh in Dermatology in 1982. He was licensed to practice in Connecticut in that same year. The defendant also got an M.D. Degree from the University of Pittsburgh in Radiology. She is licensed to practice radiology. During the years 1987-1988 she practiced radiology. She worked three days a week and earned $100,000 per year. She was laid off for lack of work. She then decided to abandon radiology and study psychiatry. She has been a resident in psychiatry since 1990. The training will be completed in June, 1994. The plaintiff feels that she broke her commitment to be a radiologist. He paid for her psychiatric training. As a resident she nets only $454 per week. He did not agree to her change of careers. It cost him great financial expense, took time away from the children and CT Page 206 caused further expenses for child care. She has been a resident in radiology and now psychiatry for nine years. He has financed all of this in addition to suffering the loss of what she could have earned for the last four years as a Radiologist at $100,000 per year part-time. The court finds that this would amount to over $160,000 per year full-time. She refused full-time work after being laid off. There was no part-time work available, but there was full-time work according to the defendant.
During the three years the defendant has been a resident, baby sitters have had to be hired to care for the children. He cared for them on weekends and evenings before the separation. The defendant has always had housekeepers and baby sitters who do the housework, laundry and care for the children.
Regarding the cause of the breakdown of the marriage, he testified that the defendant was hard to live with because she was domineering, refused to get along with people and was hostile to his family, friends and his office staff. She tried to make him choose between them and her. Her family was hostile to both of them and made them "excommunicado" for a year or more.
He testified as to specific examples of problems she caused. She was so hostile to his brother Steven and sister-in-law, Joan, that she refused to let the children visit them and their cousins. She refused to participate in a 50th wedding anniversary party, he and Steven planned for their parents. Four years ago the defendant had an argument with Joan and has refused to associate with her since. The defendant fought with other members of the plaintiff's family also. She caused difficulties with his office staff calling them "overpaid and under worked." She forbade his office manager, June Carver, to come to their house. She wanted him to fire Barbara, another one of his employees.
The defendant caused the plaintiff to break off relationships with several friends. She called his friend Wayne a "slob" and forced the plaintiff to choose between her and Wayne and Wayne's wife June. His friends from medical school, Mark and Lois, were no longer permitted to associate with him because she declared that Mark was chauvinistic and talked down to her. She would not let the plaintiff send Mark CT Page 207 a baby gift for his child.
When the plaintiff was decorating his office the defendant interfered. He was not permitted to argue with her. He bought chairs for his staff. She shouted at him and told him not to buy anything without consulting her. He felt that she believed "his office was hers to rule."
The plaintiff also testified that another difficulty in the marriage was the defendant's spending habits. He claimed she spent too much money on clothes and cosmetic surgery. The defendant had several surgeries one to her nose, two to her chin, breast implants and surgery to the veins in her legs, all for the sole purpose of improving her appearance. These surgeries cost $22,400. She also spent several hundreds of dollars studying psychic phenomenon. He believed this money was not wisely spent.
A further cause of the marriage breakup, according to the plaintiff, was the defendants refusal to have sex with him during the last four years they were together. He stated that until their separation he has been absolutely faithful to the defendant. Since the separation, January, 1991, both parties agreed to live separate lives at separate addresses, have separate social lives and to date others. The defendant moved to Old Lyme on August 10, 1991. The plaintiff remained in their Stonington home.
The defendant testified that she went to Pittsburgh to medical school because that was the plaintiff's decision and she had to follow him. She took radiology rather than psychiatry at that time because she would not have to be "on call." Because the plaintiff set up his practice of dermatology in Groton she had to complete her training in a Rhode Island hospital which was inferior to the University of Pittsburgh. She had to subdue her career to his. She is now in a psychiatric residency at Hartford Hospital. In the fall of 1987 she began work as a radiologist three days a week. She was laid off after one year. She could not get part-time work; everybody wanted full-time and she did not want to work full-time. She then decided to resume her psychiatric training in 1990. A full-time psychiatrist can make $100,000 to $150,000 per year. She believes it is now less because of insurance company rules, probably only $80,000 to $100,000. Part-time she could make $40,000. She stayed home for about CT Page 208 a year and a half to be with the children prior to 1990.
Although the defendant now claims she wants to work only part-time to be with the children, the fact is that they are now in school full-time. From 1990 when she began her residency training until the youngest child started school in the fall of 1993, a period when the two younger children were home, she chose to become a resident psychiatrist at the Hartford Hospital. She testified she leaves home at 8:00 a.m. and returns at 6:00 p.m. When the children are home they are cared for by a housekeeper or baby sitter. The court does not find credible her testimony that she now wants to work only part-time in order to care for the children.
Regarding the cause of the breakup of the marriage she testified there were several causes before she requested a separation in May of 1989. She thought he had another woman because he rejected sex with her. After the birth of their third child she wanted him to come home early from work. He worked even later claiming he was busy. She felt he just did not care about her. He became more distant, showed her no affection and refused to have sex with her. She also testified that he criticized her appearance, her nose, her chin and her lips. She claims that she had the cosmetic surgery because of his critical remarks. He is also tight with money. There was never enough heat in the house and the children complained.
The defendant also testified regarding various relationships with friends and relatives. She says he is critical of her parents who are not wealthy. They had a fight over a Christmas ham which her parents purchased because the plaintiff refused to pay for it because it cost too much. She claimed that she had a good relationship with his office staff. She helped decorate the office, arranged flowers, sent gifts to the staff and she discussed problems with the plaintiff. She denied that she ever demanded that anybody be fired.
The plaintiff called as a witness June Carver his office manager for the past eleven years. She is an LPN and assists in certain procedures. She has seen both the plaintiff, the defendant and the children many times. She testified that the defendant did not help in the office. The defendant tried to get another employee fired. She shared a baby sitter with one CT Page 209 of the office staff and had an argument with her. As a result she demanded that the employee be fired.
The plaintiff appears to be in reasonably good health. He does have high blood pressure for which he takes medication. He was also diagnosed as having hypertension. As a result he started taking Wednesdays off beginning in October, 1992.
The defendant testified that she has a viral illness, influenza, exhaustion and anemia due to stress. She also has a thyroid problem and gets tired easily. She further testified that she has Reynods Disease, numbness, carpal tunnel disease, phlebitis and has trouble with her veins. She has had tubal ligation and plans to have a hysterectomy sometime during the next year.
Although the defendant claimed many health problems, she is not presently treating for any of them. She testified that she leaves the house each day at 8:00 a.m. and returns at 6:00 p.m. There was no evidence of any lost time from work due to difficulties with her health.
According to the evidence submitted the court finds the parties have assets as follows:
 1. Real Estate — 27 Montauk Avenue, Stonington, equity $209,600; 3 Maywood Drive, Old Lyme, equity $133,833; 495 Route 184, Groton (office condominium suites 104 and 108), equity $69,640 and 16 Flanders Road, Clinton, equity $34,000.
 2. Motor Vehicles — the parties have a 1987 Saab valued at $2,250 and a 1988 Mercedes valued at $15,000. The defendant drives the Saab; the plaintiff the Mercedes. Both are in the plaintiff's name.
 3. Bank Accounts the court finds the amounts in the financial affidavits of both the parties to be in agreement with each other for the most part.
 4. Stocks, Bonds, Investments — the court finds that the parties have two Raymond James accounts, $61,642 and $122,229; a Fidelity account, $54,689; CT Page 210 an Advest account, $17,589; and an MFS Mutual Fund account, $95,710.
 5. Deferred Compensation Plans — the court finds the amounts to be as stated in the financial affidavits which are in agreement.
 6. The court finds that the plaintiff has eight shares of MD Health Plan, not transferable. He also has shares in Aircraft Partners valued at $17,000 and various Florida Land Trusts valued at $40,000.
The court also heard testimony regarding the value of the plaintiff's medical practice. Mr. Harold Nelson, an accountant and business advisor, testified that he has been the plaintiff's accountant for sixteen years and is thoroughly familiar with the financial aspects of his practice. In addition to his testimony he provided the court with a report of the plaintiff's financial records from 1989 through the end of 1993 annualized to December 31, 1993. These records disclosed that the doctor's salary was $478,000 in 1991; $435,000 in 1992 and $314,318 in 1993 annualized to December 31, 1993.
He assessed the value of the practice to be $94,350 for accounts receivable and equipment and $243,340 for goodwill. However, he also stated that there are so many dermatology patients in the area that there is a wait for an appointment from six to eight weeks. Accordingly, since the plaintiff is in a referral type practice there is little incentive for another dermatologist to purchase his practice. Such other practitioners could simply set up his or her own practice. Mr. Nelson concluded that the goodwill value of the plaintiff's practice is between zero to $243,340 with a probable target of $80,000.
The defendant presented as her expert Mr. Herbert B. Cohan, an accountant and business advisor with an office in Worcester, Massachusetts. He testified that the assets of the business were valued at $148,215 and goodwill at $700,530. He used a formula for the intangible assets of a weighted average of the adjusted net income for the years 1990, 1991 and 1992. He arrived at a figure of $467,025 as a weighted average and multiplied that by 150% to arrive at a figure of $700,530. CT Page 211
He has 100 clients in Connecticut in the medical profession. In the New London area he has 25-30 clients, doctors and dentists. He has dermatology clients elsewhere, but none in Connecticut. He was unaware that there are four dermatologists in the New London — Groton area. He claims that if the plaintiff's income is declining it is his own fault because he is not pursuing his accounts receivable and is working less hours.
The court finds the latter claims to be untrue. The plaintiff has an excellent collection ratio according to Mr. Nelson. He is working 45 hours per week with only Wednesday as his day off. Mr. Nelson stated that this is more hours than most dermatologists work. He takes only one week vacation per year.
Mr. Nelson and the plaintiff both testified that although the plaintiff is seeing as many patients a year as ever, his income is down because his costs have increased and his charges per procedure are less because Medicare, Medicaid and other federal, state and private plans will not permit the doctor to charge more than the rates that they set.
The court finds that the plaintiff has had a declining net income since 1991. There are indications that this trend will continue rather than reverse. For all of these reasons the court accepts Mr. Nelson's evaluation of the practice and rejects that of Mr. Cohan. The practice is found to have a total value of $174,350.
The court finds that the plaintiff's earning ability to be $314,318 per year plus $30,000 toward his pension for a total of $344,318. The court finds that he does not have the ability to exceed that amount annually without working more than 45 hours per week. This amount is in line with the average 1992 earnings of dermatologists in the amount of $316,283. (Plaintiff's Exhibit J.)
The court finds that the defendant earned $100,000 per year working three days per week as a radiologist. At that rate she is capable of earning over $160,000 per year for a five day week. In 1992 the average net profit for a Radiologist was $422,000; and for a Psychiatrist was $140,000. (Plaintiff's Exhibit N.) CT Page 212
The court has considered all of the criteria contained in Section 46b-56, 56a, et seq. and 46b-81, 82 and 84 of the Connecticut General Statutes in making the orders that follow.
Custody and Visitation
1. Custody. Legal custody of the three minor children, issue of the marriage, shall be jointly held by the parties. Primary residence of the children shall be with the defendant mother and she shall be entitled to make the day to day parenting decisions for the children. Plaintiff father shall exercise the custodial access as delineated below.
Recognizing that each child has a right to love both parents and to be loved by both, neither parent shall do anything to disparage or diminish the other in the eyes of the children. Having the children's best interest as a paramount concern at all times, neither parent shall do anything that would in any way interfere with the loving-relationship that the child has with both parents. Accordingly, the joint legal custody of the children shall be specifically defined and conditioned as follows:
The plaintiff is presently seeing a woman by the name of Lesley Facquier, age 36, who sometimes stays at the plaintiff's Stonington house with him and the children. Because of a problem with her and Jessica, there was a pendente lite order that she was not permitted to be alone with the children. Having heard the testimony of Ms. Facquier and the parties, the court hereby vacates the prior court's order in regard to her being alone with the children.
(a) Illness. Each party shall promptly notify the other in case of any child's serious illness while in his or her custody. "Serious illness" shall mean any illness which confines the child to bed for more than three days or any illness which requires medical intervention. "Promptly" shall be defined as within 48 hours of the initial bed confinement, prior to any medical intervention if non-emergency, and immediately from any emergency room treatment facility.
(b) Routine Medical Treatment. The parties shall at all times inform each other with respect to the health and emotional well being of the children. Each shall inform the CT Page 213 other prior to any non-emergency medical appointments. Said information shall contain the name of the physician, the purpose of the visit and the date and time of the visit. Both parties shall be entitled to the complete and full information from any pediatrician, general physician, dentist, orthodontist, consultant or specialist concerning the children and to have copies of any and all reports or records promulgated by any such physical or medical provider. Should there be any disagreement between the parties as to the efficacy of any treatment for the children that person disagreeing with the treatment shall be entitled to seek a second opinion prior to the treatment being given. The payment for the second opinion shall be made in accordance with the provisions for unreimbursed-uncovered medical expenses, supra. Should the second opinion disagree with the first either party may seek a third opinion at their own expense.
(c) School. The children shall attend public school while attending grades Kindergarten through 6. Beginning in Grade 7 through 12, the children shall attend private school. The parties shall discuss the various private school options beginning in January of the year in which the child shall attend private school. Should the parents be unable to agree on a particular school by the month of May preceding the beginning of the next school year, the child shall be enrolled at the Williams School in New London, Connecticut. The defendant mother shall pay for the cost of tuition including books and fees beginning with the September, 1994 term of school. No boarding school fees shall be specifically ordered by the court. The father shall pay all tuition, books and fees until the end of the term in June, 1994.
(d) Consultation. The parties shall consult with each other with regards to education, major medical decisions, religion and serious discipline with a view to arriving at a harmonious policy calculated to promote the child's best interest. The parties shall make every effort to set consistent standards of behavior for both homes. They shall resolve all parental conflicts without involving the children in any manner. They shall not fight in front of the children, they shall not demean the other parent or the other parent's choice of companion to the children or in front of the children. Both parents recognize that verbal attacks against or requests to carry hostile messages to the other parent is CT Page 214 a direct assault on the children's self-esteem. All three children are attached to both parents and identify with both and these bonds are damaged when one parent behaves hostilely with the other. Accordingly, neither parent shall attempt to resolve any conflict in the presence of the children. Should any issue arise that is unresolvable after consultation, the parties shall submit their disagreement to a qualified domestic relations mediator prior to resort to court action, unless time is of the essence in the best interests of the children.
(e) Relocation. Should either parent intend to relocate more than 50 miles from his or her present residence he or she shall give 60 days advance notice to the other party and the parties shall meet to determine if a modification of the judgment is necessary. If they fail to reach an agreement, they will consult with a qualified domestic relations mediator before resort to court. Absent a mutual agreement to the contrary or further order of this court the custodial access schedule shall be altered.
(f) Counseling. All orders of joint custody and access are specifically predicated upon and made in contemplation that the parties shall continue in family counseling in a meaningful fashion. The parties shall fully participate in and cooperate with any and all recommendations sessions and therapeutic programs of the treating mental health provider. A failure to do so will be viewed as contrary to the best interests of the children and a change of circumstances such that the orders of custody and access may be modified.
(g) Parenting Class. All orders of custody and access are specifically conditioned upon both parents participating in and completing a program as envisioned by Public Act 93-319. Failure to do so shall be considered by this court in any future modifications of this judgment.
2. Visitation. Plaintiff father shall have access to the children as follows:
(a) Regular Access. Until the mother completes her residency, the father shall have the children 2 1/2 weekends per month. The two full weekends shall begin on Friday at 4:00 p.m. and extend overnight to Sunday at 6:00 p.m. Should a Monday Federal holiday follow his weekend, that weekend CT Page 215 shall extend through Monday, at 6:00 p.m. The one-half weekend shall begin either on Friday at 4:00 p.m. or Saturday at noon and extend through either Saturday at 4:00 p.m. or Sunday at noon. Father shall additionally be entitled to midweek visitation on Wednesdays from 4:00 p.m. until 8:00 p.m. wherein he may take one, two or all three children to dinner taking into consideration the social activities and school workload of each of the children. After mother completes her residency, the parties shall alternate weekends. Father's midweek access shall remain the same.
(b) Summer. Plaintiff father shall be entitled to the month of August each year beginning on August 1 and extending through August 31 or the Sunday prior to the first day of school at noon, whichever comes first. During the month of August mother shall be entitled to one full weekend beginning Friday at 4:00 p.m. and extending through Sunday at 6:00 p.m. Mother shall notify father by June 15th of each year of the weekend she elects. Defendant mother shall be entitled to the month of July uninterrupted by weekend access to father beginning each year on July 1 and extending through July 31. During the month of July, however, father shall have the children for one full weekend beginning at 4:00 p.m. on Friday and ending at 6:00 p.m. on Sunday. Said weekend shall not be the 4th of July weekend and plaintiff father shall notify the defendant mother of the weekend he elects on or before June 15, of each year.
(c) School Vacations. 1. Each parent shall be entitled to one of the two full school week vacation periods. Father shall have first choice of the winter or spring vacation and shall notify mother of his election by January 1 of each year. The access to father shall begin on Friday at 4:00 p.m. and continue through the week to the following Sunday at noon. Mothers week shall include the polar weekends without access to father.
(d) Holidays.
1. Father shall be entitled to every Memorial Day weekend and every father's Day.
2. Mother shall be entitled to every July 4th weekend and every Mother's Day. CT Page 216
3. The parties shall alternate the following holidays:
 Halloween Thanksgiving Christmas Eve Christmas Day Easter
Such that father shall have Thanksgiving every odd numbered years beginning on Wednesday at 5:00 and ending Saturday at noon, he shall have Christmas Eve in every even numbered years beginning at noon, or after school and ending at 10:00 p.m. he shall have Christmas Day in every odd numbered year beginning at 10:00 a.m. and continuing for one-half of the Christmas week vacation. When he has the children on Christmas Eve he shall be entitled to the second one-half of the week long vacation. Father shall have the children on Easter from 9:00 a.m. until 6:00 p.m. in every even numbered year. He shall have access to the children every Halloween in every odd numbered year.
(e) Birthdays. The parents shall be entitled to have the children on their respective (the parent's) birthdays. If it is a school day, father's access on his birthday shall be from 4:00 p.m. until 8:00 p.m. If it is a weekend or school holiday, then the access shall be from 10:00 a.m. until 8:00 p.m. The parties shall alternate each of the children's birthdays every year.
All holiday and vacation time shall supersede and take precedence over normally schedule holidays.
(f) Floating Weekend. Each child shall be entitled to opt out of time with their father or, in the alternative opt for additional time with him on five occasions throughout the year. None of this optional time, however, shall impact either parent's holiday schedule.
(g) Adjustments. Whenever it seems necessary to adjust or vary or increase the time allotted to either party, each of the parties shall act for the best interests of the children. Reasonable efforts shall be exerted to maintain full access and unhampered contact between the children and the parties. Any adjustment or variation of access, however, shall not constitute a waiver or modification of this agreement nor CT Page 217 shall it form a sole basis for further modification by this court.
(h) Telephone Contact. Both parties shall enjoy reasonable and liberal telephone access to the children while the children are not in their custody.
3. Jurisdiction. Notwithstanding the fact that the children may be temporarily located out of the state of Connecticut, the parties shall be bound by all of the provisions of the Uniform Child Custody jurisdiction Act. Said act shall govern and control the resolution or any dispute which may hereinafter arise pertaining to the custody of or access to the children.
Child Support
A strict application of the Connecticut State Child Support Guidelines would be inapplicable in this case because of the earning abilities of the parties and their current assets.
The court awards the amount of $300 per week per child for support for a period of two years from the date of judgment to be paid by the plaintiff to the defendant. After the first two years he shall pay $400 per week per child for those children who have not attained majority. The plaintiff shall pay the full expense of any full-time boarding school for Jessica if she chooses to attend the same. While paying such expenses, the plaintiff shall not pay support to the defendant for her care.
If the parties cannot agree whether or not Jessica chooses to go to boarding school, counsel for the children shall discuss the matter with Jessica and make a written report to the court. It is the court's order that if she wants to go to boarding school she should be permitted to do so.
Medical Insurance. Both parties shall maintain medical insurance for the benefit of the minor children. The custodial parent, in this case the defendant mother, shall be designated the primary policy holder for claims submission purposes. Connecticut General Statutes 46b-84 (c) shall be incorporated by reference herein. During the residency of CT Page 218 defendant mother, plaintiff father shall pay 80% of all unreimbursed medical expenses for the children. Thereafter, he shall pay 50% of all such expenses. Medical expenses shall be broadly and inclusively defined to mean, but not limited to, general medical, surgical, prescription, orthodonture, optical, ophthalmological, catastrophic, and therapeutic expenses. Should defendant mother fail to consult with the plaintiff father regarding any medical expenditure, excluding emergency procedures, she shall be responsible for 100% of the unreimbursed costs.
Life Insurance. Plaintiff father shall maintain life insurance in the amount of $200,000 per child until each child attains his or her majority naming the children as beneficiaries in trust with defendant mother as trustee. Defendant mother shall maintain life insurance in the amount of $200,000 per child until each child attains his or her majority naming the children as beneficiaries in trust with the plaintiff father as trustee.
Trust account. Stock currently in the marital estate designated as the Raymond James Account in the aggregate amount of $123,000 shall be designated as the children's property in trust for educational expenses. ($41,000 Jessica), ($41,000 Travis), ($41,000 Tyler). The stock shall be transferred at the time of the divorce as a gift to the trust to be administered by a trustee mutually acceptable to the parties. Each child's trust shall terminate one month prior to the child's 18th birthday and the monies distributed to the child. This trust is hereby set up by judicial decree. The parties may agree to a written stipulation regarding the payment of college expenses. In that case the trust shall not terminate until college graduation or the child attains the age of 24 whichever occurs first. Any sums then remaining shall be distributed to each child as they become of age.
Alimony. The court has noted above the earning abilities of each of the parties. The court is also aware that the defendant is presently earning $454.00 per week while a resident. That program is to be completed by July, 1994. At that time the defendant will be in a position to practice psychiatry or radiology as she chooses. According to Plaintiff's Exhibit N the average income for radiologists per year was $210,500 in 1989 and $422,005 in 1992. For a psychiatrist the average income was $117,700 in 1989 and CT Page 219 $140,000 in 1992. The court understands that the defendant testified that she has chosen the profession which provides less income. She has also testified that she does not want to work full-time. She is, of course, free to make those choices. However, the law requires the court to base awards for support and alimony upon a person's ability to earn, not on the earnings they select. Therefore, the court finds that while the defendant is free to choose to work part-time at the profession which pays less, the plaintiff should not be obligated to pay the difference. The court therefore orders the plaintiff to pay the defendant $1,200 per week alimony for the first year following the date of this judgment; $1,100 per week for the second year; and $750 per week for the third year. Thereafter there shall be no further obligation to pay alimony on the part of the plaintiff. Alimony shall terminate sooner upon the death of either party, or upon the defendant's remarriage or cohabitation with another man.
Division of Assets.
a. Real Estate.
1. The plaintiff shall quit claim all his interest in the property at 3 Maywood Drive, Old Lyme to the defendant. She shall be responsible for and pay the mortgage, taxes and insurance thereon and she shall indemnify and hold harmless the plaintiff.
2. The property at 27 Montauk Avenue, Stonington, shall be sold and the proceeds divided equally between the parties. The plaintiff shall have the discretion to sell for what in his sole judgment is the best price obtainable. He shall receive a credit for the reduction in the mortgage balance since the entry of the pendente lite order on November, 1992 to the date of the sale. Said sum shall be first paid to him and the remaining proceeds shall be divided equally between the parties.
3. The property at 16 Flanders Road, Clinton, a condominium, shall be sold as soon as feasible. The parties shall cooperate on the listing price and agree on the acceptance of any offers. The net proceeds shall be divided equally between the parties.
4. The office condominiums, suites 104 and 108 located CT Page 220 at Route 184, Groton, where the plaintiff conducts his medical practice shall be retained by the plaintiff free of any claim by the defendant. He shall be solely responsible for the mortgage, taxes, insurance and condominium fees.
The plaintiff shall retain the 1988 Mercedes and the defendant shall retain the 1987 Saab. The plaintiff shall execute whatever documents are necessary to transfer the title and the registration of the Saab to the defendant. The court is aware of the defendant's testimony regarding the Saab, however, with the alimony awarded and the division of assets allocated further on in this decision, the defendant has ample assets to purchase a new car if she feels she needs one.
Regarding personal property, meaning household goods, furniture, jewelry and the like, each party shall keep whatever he or she now possesses free from any claim by the other.
The defendant shall have no claim whatsoever to any interest in the plaintiff's medical practice. The court finds that the practice was created, developed and operated solely by the plaintiff. All assets of the parties with the exception of certain pension and retirement plans in the defendant's name, were obtained by the plaintiff through the practice of his profession. Accordingly, he should be, and is entitled, to retain sole ownership and possession of the medical practice.
By the same token the plaintiff shall have no right to alimony from the proceeds of any medical practice the defendant shall establish. Any earnings she obtains shall be retained by her.
Bank Accounts. The plaintiff shall retain the checking and savings accounts in Fleet Bank in his name containing $100 and $300 respectively and the defendant her checking and savings accounts in the amounts of $217 and $500 respectively. The Charter Oak Credit Union accounts in the plaintiffs name in the amounts on his affidavit of $2,324; Heritage Money Market $144; Manchester Savings Bank $1,000; and the accounts in the joint names of the parties, Fidelity Money Market — $8,346 and Heritage Money Market $3,376 shall all be divided equally between the parties. CT Page 221
Stocks, Bonds, Mutual Funds. As previously stated in this decision, the Raymond James Account, presently in the plaintiff's name, in the amount of $61,642, and the amount in the joint account in the amount of $122,229 shall be used, in part, to set up a trust account for the children. The amount of $26,000 from the plaintiff's account, and $96,798 from the joint account shall be so designated. The trust accounts for the children shall be set up as previously set forth in this decision. The balance of the accounts $35,642 in the plaintiff's name and $25,431 in the joint account shall be divided equally between the parties. The Fidelity Account, $54,689, the Advest Account, $17,589 and the MFS Mutual Fund Account, $95,710 shall be divided equally between the parties. The amounts listed here are approximate since the court recognizes that the exact amounts may vary from day to day.
Deferred Compensation Plan.
The plaintiff shall retain his interest in his pension and profit sharing plan as shown on his financial affidavit. The defendant shall have no claim to his pension or profit sharing plan. The defendant shall retain her pension or retirement plans, listed on her financial affidavit as U — Conn — TIAA, $13,000 and South Country Hospital, $4,679. The IRA accounts in the defendant's name, Equitable, $7,000; and Travelers, $7,000 shall all be retained by the defendant. The IRA accounts in the plaintiff's name as listed on his affidavit: Equitable, $6,495; Equitable, $52,211; Travelers, $6,528 and Aetna, $57,494 shall be divided equally between the parties.
Other Assets. Eight shares of MD Health Plan (H) (nontransferable) shall be retained by the plaintiff. The Aircraft Partners and Florida Land Trust accounts presently in the plaintiff's name appear to be of uncertain value and not able to be sold at this time. Accordingly, the court awards one half the value of these assets to each party at this time.
The court notes that the plaintiff is the beneficiary of the estate of his uncle in the amount of a one fifth share, value unknown. The court awards this to the plaintiff alone. The defendant is to have no share of any inheritance to the plaintiff from his uncle. CT Page 222
There was also testimony that the plaintiff is named as an owner of a bank account at the Manchester Savings Bank. The account is in his name, his brother Steven's name and his parents, Isadore and Gertrude Wolf. The plaintiff explained that this account is his parent's savings and retirement money. His name and that of his brother are on the account so that they can take care of it for their parents should they be unable to do so, The plaintiff shall retain this account in his name and neither the defendant nor the children shall have any interest in it.
The plaintiff is not awarded alimony and he shall have no claim to the defendant's future earnings.
Attorneys Fees Costs. The court has carefully considered the standards set forth by the legislature in regard to counsel fees. The court has reviewed extensively the earning abilities of the parties, the ample awards for the children and the division of the substantial assets of the parties. The court has followed the statutory command as set forth in Section 46b-62 and 46b-82 of the Connecticut General Statutes, to consider the parties financial abilities, including other orders of the court in deciding whether the parties are financially able to pay their own counsel fees should they be permitted to do so. Accordingly, the court orders that the plaintiff pay his own counsel fees and coats including the fee of his expert, Harold A. Nelson. The plaintiff is also ordered to pay the balance of Attorney Susan Connolly's fee, as attorney for the children in the amount of $7,680. The court is aware that the total fee was $8,055 of which the defendant paid $375. The defendant is ordered to pay her own counsel fees and costs, including the fee of her expert, Herbert B. Cohan.
(See Attached for Summary of Financial Distribution)
Hurley, J.
SUMMARY OF FINANCIAL DISTRIBUTION
A. ASSETS TO TO TO VALUE/EQUITY PLAINTIFF DEFENDANT CHILDREN
Real Estate 447,073 191,440 255,633 Bank Accounts 16,307 7,995 8,312 CT Page 223 Stocks, Bonds Mut. Funds 351,859 114,529 114,529 122,798 Def. Comp. 418,990 325,947 93,043 Other Assets 57,000 28,500 28,500 _______ _______ _______ _______ Total 1,291,229 668,411 500,017 122,798
B. ALIMONY 
SUPPORT
1st Year Alimony 1,200 Support 900 2,100 2nd Year Alimony 1,100 Support 900 2,000 3rd Year Alimony 750 Support 1,200 1,950 4th Year Alimony 0 Support 1,200 1,200
C. VALUE OF PLAINTIFF'S DERMATOLOGY PRACTICE
174,350 174,350
ASSETS TO TO VALUE/EQUITY PLAINTIFF DEFENDANT
1. Real Estate
Old Lyme Home 133,833 133,833 Stonington Home 209,600 104,800 104,800 Office — Groton 69,640 69,640 Condo — Clinton 34,000 17,000 17,000 _______ _______ _______ Total 447,073 191,440 255,633
2. Bank Accounts
Fleet 1,117 400 717 Charter Oak 2,324 1,162 1,162 Fidelity Money Mkt. 8,346 4,173 4,173 Heritage Money Mkt. 144 72 72 Heritage Money Mkt. 3,376 1,688 1,688 Manchester Savings 1,000 500 500 _____ _____ _____ Total 16,307 7,995 8,312
3. Stocks, Bonds Mut. Funds To Children CT Page 224
Raymond James (H) 61,642 26,000 17,821 17,821 Raymond James (J) 122,229 96,798 12,715 12,715 Fidelity (J) 54,689 27,344 27,345 Advest (H) 17,589 8,794 8,795 MFS (H) 95,710 47,855 47,855 _______ ______ ______ Total 351,859 122,798 114,529 114,531
ASSETS TO TO VALUE/EQUITY PLAINTIFF DEFENDANT
4. Deferred Comp. Plans
Pension (H) 189,571 189,571 Profit Sharing (H) 75,012 75,012 IRA Equitable (H) 6,495 3,247 3,247 IRA Equitable (H) 52,211 26,106 26,106 IRA Travelers (H) 6,528 3,264 3,264 IRA Aetna (H) 57,494 28,747 28,747 IRA Equitable (W) 7,000 7,000 IRA Travelers (W) 7,000 7,000 IRA S. County Hosp. (W) 4,679 4,679 IRA U Conn Health (W) 13,000 13,000 ------- ------- ------ Total 418,990 325,947 93,043
5. Other Assets
Aircraft Partners (H) 17,000* 7,500 7,500 Florida Land Trusts (H) 40,000* 20,000 20,000 ------ ------ ------ Total 57,000 28,500 28,500